DISTRICT OF OREGON, ss:                          AFFIDAVIT OF NATHAN BRESEE

### Affidavit in Support of a Criminal Complaint

I, Nathan Bresee, being first duly sworn, hereby depose and state as follows:

### Introduction and Agent Background

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7).  I am a Special Agent with Homeland Security Investigations (HSI) and have been since December 2009.  While employed with HSI, I have attended numerous training courses, including the Immigration and Customs Enforcement Special Agent Training course, Criminal Investigator Training Program, and specialized courses in narcotics trafficking investigations.  I am currently assigned to the HSI Portland Narcotics and Bulk Cash Smuggling group in Portland, Oregon. I have 20 years of experience as a law enforcement officer.  Prior to my employment with HSI, I was a Customs and Border Protection Officer (CBPO) assigned to the Contraband Enforcement Team.  As a Special Agent, I have participated in numerous drug investigations as either the lead case agent or as a supporting investigative agent.  I am familiar with narcotics traffickers' methods of operation, including the manufacture, storage, transportation, and distribution of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering.  I am familiar with how drug traffickers utilize counter-surveillance techniques to avoid detection by law enforcement. Additionally, I have also been involved in investigations involving wiretaps as part of the federal investigations into narcotics trafficking.

### Purpose of Affidavit

2.      This affidavit is submitted to support a criminal complaint and arrest warrant for **SANTOS ALISAEL AGUILAR MAYA,** Hispanic male, date of birth 10/xx/1991(hereinafter,

**Affidavit of HSI Special Agent Nathan Bresee**                                              **Page 1**

"**MAYA**"), **MARCO ANTONIO MAGALLON,** Hispanic male, date of birth 06/xx/1979

(hereinafter, "**MAGALLON**"), **LUIS DELEON WOODWARD**, Hispanic male, date of birth

07/xx/1997 (hereinafter, "**DELEON**"), and **JORGE LUIS AMADOR**, Hispanic male, date of

birth 08/xx/1998 (hereinafter, "**AMADOR**"), for engaging in a criminal conspiracy to distribute

and possess with the intent to distribute 400 grams or more of a mixture and substance

containing fentanyl, a Schedule II controlled substance, and possession with intent to distribute

400 grams or more of a mixture and substance containing fentanyl, a Schedule II controlled

substance, all in violation of 21 U.S.C. §§ 841(a)(l), 841(b)(1)(A), and 846.

   3.      I have obtained the facts set forth in this affidavit through my personal

participation in the investigation described below; from oral and written reports of other law

enforcement officers; and, from records, documents and other evidence obtained during this

investigation.  I have obtained and read official reports prepared by law enforcement officers

participating in this investigation and in other related investigations.

### Confidential Informants

   4.      HSI Confidential Informant (CI) has provided reliable and actionable information

to law enforcement in exchange for monetary compensation and immigration benefits since

January 2014.  No promises or guarantees have been made by investigators in order to gain the

CI's cooperation.  The CI has provided information that led to arrests and seizure of

contraband.  He/she has been convicted once for possession of controlled substances.  He/she has

admitted to having an extensive history of drug trafficking and has first-hand knowledge of

marijuana, methamphetamine, cocaine, fentanyl, and heroin distribution.  Based on the  CI's

ability to conduct recorded, drug-related, phone calls with a Target Subject, and observations of

///

**Affidavit of HSI Special Agent Nathan Bresee**                                        **Page 2**

physical surveillance that corroborate the CI's ability to order narcotics from a Target Subject, I believe the information he/she has provided to be credible and reliable.

### Statement of Probable Cause

5.      During the later part of January 2024, I learned from the CI, that he/she acting in his/her capacity as a CI, had learned that a Mexico based Transnational Criminal Organizations (TCO) was planning an extremely large shipment of liquid fentanyl and that the shipment was destined to arrive in the District of Oregon within the coming days.

6.      On the afternoon of January 24, 2024, I received information from the CI, that he/she had received information regarding a specific U-Haul box truck (U-Haul) that was to be used by the TCO to transport the liquid fentanyl into the District of Oregon.  I provided this information to investigators, who then contacted U-Haul security in order to obtain the rental information for the U-Haul.  Investigators learned from U-Haul security, on this same date, **AMADOR** rented a 26-foot box truck, bearing Arizona license plate AM09199 and U-Haul identification number JH-1892-L in Yakima, Washington and the vehicle was scheduled to be returned in Gresham, Oregon within two days.

7.      Investigators, based on the information provided by the CI and U-Haul security, established surveillance along I-84, which according to Google Maps was the most probable route to arrive in the greater Portland, Oregon metropolitan area.

8.      On the early morning of January 25, 2024, investigators observed the U-Haul, later observed and learned to be operated by **AMADOR**, pass by them heading west on I-84 near Bonneville, Oregon.  Additionally, investigators observed the U-Haul was traveling in tandem with a red Dodge Ram pickup truck (pickup) bearing Washington license plate D60307B.

///

**Affidavit of HSI Special Agent Nathan Bresee**                                                    **Page 3**

According to Washington DMV records, the pickup is currently registered to **MAGALLON** in Yakima, Washington.

9. Investigators followed the two vehicles and observed them arrive at a commercial parking lot in Beaverton, Oregon. From when they first established surveillance on the two vehicle near Bonneville, Oregon and when they arrived together at the parking lot in Beaverton, Oregon, the two vehicles traveled together in tandem for over 47 miles (approximately one hour). Investigators watched as the two vehicles remained parked in the commercial parking lot for approximately 10 minutes and they appeared to be waiting for someone to arrive. The two vehicles then left the parking lot together. Investigators continued surveillance of the two vehicles as they departed the commercial parking lot and watched them arrive at a Motel 6 in Tigard, Oregon. This entire time they were under surveillance the two vehicles traveled in tandem. Investigators observed **MAGALLON** exit the pickup and enter the Motel 6 lobby management office. Investigators then observed **MAGALLON**, along with **AMADOR** and two other individuals who exited the vehicles enter room 115. Investigators checked with Motel 6 management, who advised **MAGALLON** had secured room 115 for the night. After a period of time investigators concluded surveillance for the morning.

10. On the morning of January 24, 2024, based on the information provided by the CI and U-Haul security, and observations made by investigators during surveillance of the U-Haul and pickup, I applied for a search warrant for the pickup, the U-Haul truck, and Room 115 at the Motel 6. The warrant was subsequently reviewed and authorized by the Honorable United States Magistrate Judge Stacie Beckerman.

11. Later that same morning, investigators, and members of the Washington County Sheriff's Office (WSCO) Tactical Negotiations Team (TNT) reestablished surveillance of the

**Affidavit of HSI Special Agent Nathan Bresee**                                                      **Page 4**

two vehicles in the Motel 6 parking lot.  Below is a photograph of the parking lot that morning

depicting the red pickup, which is parked in front of room 115, and the U-Haul nearby:



12.     After reestablishing surveillance and developing an operational plan, WSCO-TNT

executed the warrant and secured the scene for investigators.  WSCO-TNT detained five subjects

from the Motel room; **MAYA**, **MAGALLON**, **AMADOR**, **DELEON**, and another individual

who had agreed to come to Portland, Oregon with **AMADOR**.  Investigators learned that during

the execution of the warrant, **AMADOR** attempted to flee the scene through a window located in

the rear of Room 115, where he was immediately met by law enforcement and subsequently

detained and returned inside of the room.

13.     Investigators searched Room 115 and seized two loaded firearms, depicted below:

**Affidavit of HSI Special Agent Nathan Bresee**                                                                 **Page 5**



14.      WSCO K-9 Deputy Colburn, utilizing K-9 "Mando," conducted a sweep of the U-

Haul and the pickup.  Mando is a 4-year-old German Shepherd/Belgian Malinois mix.  In April

2023, Mando and Deputy Colburn became a certified narcotic detection team through the Oregon

Police Canine Association.  In February 2023, Mando and Deputy Colburn became a certified

narcotic detection team through the California Narcotic Canine Association.  Mando and Deputy

Colburn have participated and completed a 264-hour narcotic detection school, and continually

train a minimum of 16 hours a month.  Mando is trained to locate and alert only upon detecting

the odors of Cocaine, Methamphetamine, Heroin, and/or Fentanyl.  Mando is a passive alert dog

which means his final response is to down and stare as a passive alert but still will sometimes

scratch at the source of odor.  While inspecting the pickup, Deputy Colburn, and K-9 "Mando"

**Affidavit of HSI Special Agent Nathan Bresee** **Page 6**

did not receive a positive alert for the presence of narcotics within the pickup. While inspecting

the U-Haul, Deputy Colburn, and K-9 "Mando" received a positive alert for the presence of

narcotics within the U-Haul. Investigators searched the U-Haul and located eight 55-gallon

barrels containing liquid fentanyl in the cargo area. The eight barrels were almost completely

full. Below is a photograph of "Mando" at the rear of the U-Haul with the eight barrels of liquid

fentanyl visible in the background and a separate picture of the eight barrels of liquid fentanyl:



///

///

///

**Affidavit of HSI Special Agent Nathan Bresee**                                                **Page 7**



15.     Investigators, for officer safety and the safety of the surrounding citizens, did not

attempt to remove the liquid fentanyl from the U-Haul at the scene, and instead chose to utilize

the U-Haul to transport the narcotics to WSCO evidence room.  Investigators then donned Level

1 hazardous response safety gear, removed the liquid fentanyl from the U-Haul and conducted

narcotics field tests on each of the eight 55-gallon barrels, all of which returned positive results

for the presence of fentanyl, a Schedule II controlled substance.  I know that a single full 55-

gallon barrel contains approximately 208 liters.  I also know that a liter of water weighs one

kilogram.  Collectively, based upon how full they are, the eight 55-gallon barrels are estimated to

contain approximately 1,600 liters of a mixture and substance containing fentanyl for an

approximate weight of 1,600 kilograms (1.6 metric tons).  Below are several photos of the

**Affidavit of HSI Special Agent Nathan Bresee**                                                                 **Page 8**

HAZMAT team and field test results (note, the eight barrels were logged into WCSO evidence under item numbers 7-14:



///

///

///

**Affidavit of HSI Special Agent Nathan Bresee**                    **Page 9**









16.     I advised **MAYA** of his Constitutional Rights *Miranda*, in the Spanish language and he agreed to speak with investigators.  During a post-arrest interview, **MAYA** initially advised he came to Oregon to go shopping at a mall, but later recanted his story and admitted he knew a lot of information about drug trafficking in Yakima, Washington and Los Angeles, California.  **MAYA** claimed responsibility for making the liquid inside the eight 55-gallon barrels seized the U-Haul.  **MAYA** was to be paid $10,000 U.S. currency upon completion of the narcotics transaction.  **MAYA** claimed ownership of the "4-5" (45 caliber) firearm in Room 115; as previously stated investigators seized two firearms, one of which was a .45 caliber handgun. **MAYA** is from Tampico Tamaulipas, Mexico, where he admitted to previously being employed as a methamphetamine cook for seven years.  As a result of **MAYA's** illegal activity in Mexico, he was arrested and served nearly five years in a Mexican prison.

17.     I advised **AMADOR** of his Constitutional Rights *Miranda*, in the Spanish language and he agreed to speak with investigators.  **AMADOR** advised that he had been directed to rent a U-Haul in Yakima, Washington.  After renting the U-Haul, he drove to a pet store parking lot in Yakima where he left the U-Haul with the keys in it.  **AMADOR** after going to get something to eat returned to the pet store parking lot, during this time **AMADOR** believes someone unknown to him loaded the narcotics into the vehicle.  **AMADOR** was evasive and less than truthful in answering investigators questions, at which point the interview was conclude.

18.     Detective Jason Buelt advised **MAGALLON** and **DELEON** separately of their Constitutional Rights *Miranda*, in the English language, and they individually agreed to speak with investigators.  **MAGALLON** and **DELEON** did not provide any relevant information to investigators, and Detective Buelt noted they were both evasive and less than truthful in

///

**Affidavit of HSI Special Agent Nathan Bresee**                                                        **Page 12**

answering investigators questions.  **MAGALLON** and **DELEON** eventually both asked for a

lawyer to be present during any further questioning, and this concluded their separate interviews.

19.    I know, based upon my training and experience, that TCO's employ many

individuals, in various roles, to help carry out their illegal drug trafficking operations.  I also

know that drug traffickers do not entrust large amounts of narcotics to unsuspecting people and

drug traffickers regularly employ other people to help them in delivering narcotics.  Working

together and traveling in teams allows drug traffickers to alternate who is driving so they can

travel long distances without frequent stops, provides a passenger or additional vehicle who can

operate as a lookout for law enforcement, and provides an added level of protection from being

robbed.  I also know that firearms are tools of the trade of drug dealers and that dealers regularly

possess firearms for protection again being robbed.

20.    I know, based upon my training an experience, that Mexico based Transnational

Criminal Organizations (TCO) are attempting to increase their profit margins by introducing

injectable liquid fentanyl into the U.S. market.  According to sources, the TCO's are still trying

to develop the correct formulation, hence there have been range of concentrations and different

compositions and have advised to market a syringe worth of liquid narcotics for $20 each.

Samples of seizures around the U.S., which usually contain some adulterants, are roughly

estimated to contain fentanyl concentrations between 0.01 to 0.045%.  At a concentration of

.01% fentanyl (the samples were between .01-.045%) a dealer has the potential to make

approximately 5,000 - 2mg doses per liter of liquid fentanyl.  I know a potentially fatal dose of

fentanyl is 2mg.  Accordingly, I know that a person possessing approximately 1,600 liters of

liquid fentanyl has the ability to make approximately 8,000,000 individual 2mg doses and such

///

**Affidavit of HSI Special Agent Nathan Bresee**                                        **Page 13**

an amount indicates that it is not possessed for personal use but rather such a quantity indicates that it is possessed for purposes of further distribution.

## Conclusion

21.     Based on the foregoing, I have probable cause to believe, and I do believe, that **SANTOS ALISAEL AGUILAR MAYA, MARCO ANTONIO MAGALLON, LUIS DELEON WOODWARD**, and **JORGE LUIS AMADOR** have committed the crimes of Conspiracy to Distribute and Possess with the Intent to Distribute 400 grams or more of a mixture and substance containing fentanyl, a Schedule II controlled substance, and Possession with Intent to Distribute 400 grams or more of a mixture and substance containing fentanyl, a Schedule II controlled substance, all in violation of 21 U.S.C. §§ 841(a)(l), 841(b)(1)(A), and 846.  I therefore request that the Court issue a criminal complaint and arrest warrant for **SANTOS ALISAEL AGUILAR MAYA, MARCO ANTONIO MAGALLON, LUIS DELEON WOODWARD**, and **JORGE LUIS AMADOR**.

22.     Prior to being submitted to the Court, this affidavit, the accompanying complaint, and the arrest warrant were all reviewed by Assistant United States Attorney Scott Kerin.  AUSA Kerin advised me that in his opinion the affidavit and complaint are legally and factually sufficient to establish probable cause to support the issuance of the requested criminal complaint and arrest warrant.

## Request for Sealing

23.     I further request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of the requested criminal complaint, including the complaint, this affidavit, and the requested arrest warrants.  I believe that sealing these documents is necessary because the information is relevant to an ongoing investigation and any

**Affidavit of HSI Special Agent Nathan Bresee**                                                           **Page 14**

disclosure of the information at this time may endanger the life or physical safety of an

individual, cause flight from prosecution, cause destruction of or tampering with evidence, cause

intimidation of potential witnesses, or otherwise seriously jeopardize an investigation.

Premature disclosure of the contents of the application, this affidavit, the attachments, and the

requested search warrant may adversely affect the integrity of the investigation.

*By phone pursuant to Fed R. Crim. P. 4.1*

NATHAN BRESEE
Special Agent, Homeland Security Investigations

Subscribed and sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone at 5:53 p.m. on 26th day of January 2024.

HONORABLE STACIE F. BECKERMAN
UNITED STATES MAGISTRATE JUDGE

**Affidavit of HSI Special Agent Nathan Bresee**                                    **Page 15**